UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X
ROBERT PICARDI,
Soc. Sec. #XXX-XX-4726,

                          Plaintiff,

                                                   **REPORT AND RECOMMENDATION**

          -against-
                                                   20-CV-5315 (LJL)(KNF)

COMMISSIONER OF SOCIAL
SECURITY,


                          Defendant.
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE LEWIS J. LIMAN, UNITED STATES DISTRICT JUDGE

          Robert Picardi ("Picardi") commenced this action against the Commissioner of Social

Security (the "Commissioner"), seeking review of an administrative law judge's ("ALJ")

February 6, 2019 decision finding Picardi ineligible for disability insurance benefits, pursuant to

Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-43.  Before the Court is Picardi's

motion for judgment on the pleadings, Docket Entry No. 14, and the Commissioner's cross-

motion for judgment on the pleadings, Docket Entry No. 18.

                                    **ALJ'S DECISION**

          The ALJ found that Picardi (1) meets the SSA insured status requirements through

December 31, 2021; (2) has not engaged in substantial gainful activity since June 22, 2016, the

alleged disability onset date; (3) "has the following severe impairments: subglottic stenosis;

asthma; and status post remote arthroscopic meniscal repair, bilateral knees"; and (4) does not

have an impairment or combination of impairments that meets or medically equals the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found that Picardi "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) but with additional limitations. He can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. The claimant is able to perform work that allows him to avoid concentrated exposure to dust, fumes, gases, odors and poor ventilation."

The ALJ noted that Picardi suffered from "residual subglottic stenosis (a narrowing of the throat) secondary to inflammation of scar tissue in his throat" and that Picardi claimed

> he is disabled due to scar tissue in his throat that causes difficulty with breathing when he exerts, including walking.  He added that he must not sit down for a while after eating to avoid gas pain in his stomach. [Picardi] stated that he would miss a lot of work if he were employed by a private company because he needs time off—approximately three to five days, to recover from injections administered to his neck, asserting that he gets these injections over the course of three consecutive months.

The ALJ noted that despite Picardi's trouble with breathing following major exertion, he remained very active and had reported walking and running long distances to his treating general practitioner Dr. Eli Goldner ("Dr. Goldner") and treating ear, nose and throat specialist Dr. Mark Courey ("Dr. Courey"), as documented in the physicians' treating notes.

The ALJ found that "the record confirms that [Picardi] has required steroid injections to mitigate swelling/inflammation in his throat on multiple occasions. . . . However, the record fails to support that the claimant had difficulty recovering from these injections for multiple days to the point that he would otherwise miss work for multiple days afterward."  The ALJ recounted Picardi's history of receiving injections of Kenalog, a steroid, through the relevant period, beginning with his "fourth surgical dilation, with steroid injections, in July 2016"; the ALJ noted that this was the last time that Picardi's condition had required surgery.  Picardi also received steroid injections in October 2016; May, October, November, and December 2017; and August

2

2018; in each case, he reported that his breathing had improved following the injection. The ALJ emphasized that "[c]uriously, neither Dr. Goldner nor Dr. Courey noted that the claimant ever reported any problematic side effects from the injections." According to the ALJ, the only potentially relevant comments made by Picardi's physicians were Dr. Courey's notation that Picardi reported "improvement about 10 days after the injection" in October 2016 and May 2017, and a notation that following the September 2017 injection that it took Picardi "six days or so to feel better." According to the ALJ, "there is no evidence to support that the injections he received caused side effects or debilitating symptoms that would have required multiple days to recover from, only that *improvement* took as long as 10 days after administration of the injections."

In considering the opinion evidence to determine Picardi's residual functional capacity ("RFC"), the ALJ afforded "some weight" to the assessments of the "State agency's medical consultant," Dr. A. Holmberg ("Dr. Holmberg"), that Picardi was "capable of a range of light exertional work without vocationally-prohibitive nonexertional (physical) limitations." The ALJ afforded "some weight" to the opinion of consultative examiner Dr. Nina Spooner ("Dr. Spooner"), that Picardi had a "'moderate' limitation for climbing stairs, lifting and carrying; that he should avoid smoke, dust and other known respiratory irritants; that he should avoid 'heavy exertion as it tends to make him dyspneic' (i.e. short of breath); and that he would have 'marked' limitation kneeling." According to the ALJ, Dr. Spooner's limitations on kneeling and climbing are "not correlated to any of her findings and are simply incompatible with the claimant's self-described abilities," including his ability to walk and run long distances. The ALJ afforded "great weight to the evidence provided by Dr. Courey—including the claimant's own subjective reports."

The ALJ found further that Picardi "is unable to perform any past relevant work"; was a "younger individual age 18-49 on the alleged disability onset date" and "subsequently changed age category to closely approaching advanced age"; "has at least a high school education and is able to communicate in English"; and "has acquired work skills from past relevant work."

Considering Picardi's age, education, work experience, and RFC, the ALJ determined Picardi "has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy."   The ALJ noted that the vocational expert testified that an individual with Picardi's age, education, work experience, and RFC would be able to perform the requirements of occupations such as park aide, security guard, and alarm investigator.  The ALJ concluded that Picardi has not been under a disability from June 22, 2016, though the date of the decision.

## PICARDI'S CONTENTIONS

Picardi contends that the ALJ's determination of Picardi's "RFC was not supported by substantial evidence because the ALJ failed to properly consider [Picardi's] allegations and improperly used her lay opinion to discredit his allegations instead of developing the record."

Picardi contends that the ALJ omitted improperly reference to Picardi's difficulty breathing in humid conditions both in her hypotheticals posed to the vocational expert and in her RFC determination. Picardi contends that the Commissioner had the burden to show sufficient work exists in the national economy that Picard could perform. However, two of the jobs the ALJ determined that Picardi could perform, park aide and security guard, involve frequent exposure to weather, which, according to Picardi, includes humidity. If the ALJ had included in her hypotheticals that Picardi needed to avoid humidity, Picardi "would have been found unable to perform those two jobs." This would leave the job "alarm investigator."  Approximately 2,300

such jobs exist in the national economy, which is not enough to be considered a significant number; therefore, according to Picardi, the Commissioner would not meet her burden and Picardi should have been found to be disabled.

Picardi contends that the ALJ did not consider properly Picardi's testimony that he would be unable to maintain employment due to missing too many days of work, because he receives Kenalog injections in his throat once per month, for three consecutive months, to treat his subglottic stenosis. Picardi maintains that for each injection, he must absent himself from work for one day to undergo the procedure and then absent himself from work between three and five days to recover from the procedure, as the procedure is painful.  Following the third month, he is monitored, and the injections start again three to six months later, as necessary.  Picardi contends that the ALJ erred in finding that "the record fails to support that the claimant had difficulty recovering from these injections for multiple days to the point that he would otherwise miss work for multiple days afterward" and that Picardi's doctors did not "note that the Plaintiff ever reported any problematic side effects from the injections."   According to Picardi, Dr. Courey's treatment notes state that Picardi "noted improvement about 10 days after the injection[s]" in October 2016 and May 2017, and that prior to the October 2016 injection, Dr. Courey had "discussed the risk of failure, injection pain, and airway obstruction possible when undergoing these injections."  In October 2017, a treatment note states that "it too[k] 6 or so days to feel better" after his injection in September 2017; according to Picardi, this "could certainly indicate" that Picardi would be absent from work for multiple days to recuperate following each injection. Picardi contends that Dr. Courey did not provide more detail about their conversations because the primary function of his records was to promote communication and recordkeeping; because the treatment was not going to be changed, there was no need for Dr. Courey to describe his

conversation with Picardi in more detail.  Moreover, Dr. Courey's treatment notes are not

inconsistent with Picardi's testimony that he needed multiple days off from work to recover

following each injection and, thus, are not a basis to discredit Picardi's testimony.

Picardi contends that the ALJ erred in not providing for any absences from work in her RFC,

given Picardi's testimony about time off he would need to recover from injections coupled with

his testimony that he would also need to be absent one day every three months for bloodwork

due to his thrombocytosis. Picardi maintains that the ALJ's failure to factor any absences into the

RFC was not harmless, as the vocational expert testified that two or more absences per month

would preclude working at the occupations the ALJ found that Picardi was able to perform.

Picardi contends that the ALJ's decision emphasized strongly Picardi's ability to walk

and run; however, a person "need not be invalid to be disabled." According to Picardi, his

statement in June 2015 that he could walk seven miles each day was made a year prior to the

alleged disability onset date.  The ALJ noted that Picardi told his medical provider that "although

he was having more shortness of breath with running, he was still able to run nine miles each

week" and that Picardi testified he walks four miles a day; however, neither statement is

inconsistent with his testimony regarding his need for multiple days to recover from the

injections.  Picardi contends that "the ALJ fails to craft a logical bridge between [Picardi's]

ability to run and walk on a normal day and a decision to discredit his testimony about

recuperating from a painful procedure."  Picardi maintains that he testified that he needs to

remain active due to his "GERD and the side effects of his fundoplication surgery."  He testified

that he needs to keep moving after he eats to avoid severe gas pain and needs to maintain a

certain weight to avoid stress, pain, and breathing difficulty; therefore, "[g]iven his abdominal

condition, he may logically choose to walk even when breathing is somewhat difficult to avoid severe pain."

Picardi maintains that, because none of the medical opinions in the record considered his need for recovery after his injections or concerned the number of absences needed for him to recover from the procedure, the ALJ had a duty to develop the record further by seeking medical opinions on these topics. According to Picardi, the ALJ should have done this by "re-contacting the treating sources, order[ing] an additional consultative examination, or [having] a medical expert testify about the issue." Picardi asserts that, instead of developing the record further, the ALJ substituted improperly her lay opinion for a medical opinion, when she "had no way of knowing what impact percutaneous injections of Kenalog into multiple areas of the subglottic would have on an individual's ability to work in the days immediately following the procedure" and "[the] only information we have about the need for absences due to a recovery period following these injections is from [Picardi] himself." Moreover, Picardi contends that the medical opinions in the record that concerned Picardi's limitations were stale, because they were from April 2017, and the medical providers would not have known that Picardi would later begin a course of treatment involving a series of monthly steroid injections that would then need to be repeated three to six months later. They also would not have known the Picardi would need to attend bloodwork appointments every three months. According to Picardi, "[given] the stale nature of the information before them, the state agency consultant and Dr. [Nina] Spooner's opinion were not able to provide a true indication of [Picardi's] functional limitation and failed entirely to provide any guidance on the need for recovery time. However, the ALJ proceeded to craft the RFC and decision without any medical opinion to guide her about this important issue."

Picardi contends that the ALJ's errors were not harmless, and requests that the Commissioner's decision be vacated and that the matter be remanded for further administrative proceedings.

## COMMISSIONER'S CONTENTIONS

The Commissioner contends that the ALJ's decision is both legally correct and supported by substantial evidence.  According to the Commissioner, substantial evidence supports the ALJ's RFC finding. The Commissioner maintains that in crafting the RFC, the ALJ acknowledged appropriately that Picardi has subglottic stenosis and asthma and therefore incorporated environmental concerns into the RFC by limiting Picardi to "work that allows him to avoid concentrated exposure to dust, fumes, gases, odors, and poor ventilation."  The Commissioner contends that Picardi's medical providers' treatment records support the ALJ's RFC finding that Picardi's severe impairments "were not so extreme that they precluded light work with additional limitations."  The Commissioner maintains that the ALJ considered appropriately that, following an incision and dilation procedure to treat Picardi's subglottic stenosis in July 2016, Dr. Courey noted that: 1) Picardi's condition had improved; 2) Picardi had resumed running without shortness of breath; 3) Picardi's voice was within normal limits; and 4) Picardi felt "great."  Additionally, Dr. Courey's treatment notes indicated that Picardi's condition had improved following injections in May, October, November, and December 2017, and that the next injection was not administered until August 2018, with no indication in the treatment records that Picardi had lingering symptoms in the intervening months.  According to the Commissioner, the ALJ considered appropriately Picardi's "status-post remote arthroscopic meniscal repair of the bilateral knees" by limiting Picardi to light work and considered

appropriately treatment notes regarding Picardi's asthma in arriving at the RFC determination as well.

The Commissioner asserts that the ALJ's RFC determination is also supported by the opinion of Dr. Spooner, who examined Picardi on April 3, 2017.  According to the Commissioner, the ALJ accorded appropriately "some weight" to Dr. Spooner's opinion, finding that her opinion that Picardi had a marked limitation for kneeling and a mild limitation for climbing stairs was inconsistent with Picardi's testimony that he could run and walk long distances, as well as Dr. Spooner's findings that Picardi could perform a full squat, had full range of motion in his knees, could get on and off the examination table without help, could rise from a chair without difficulty, and had a normal gait. In addition, the ALJ observed that Dr. Spooner's examination of Picardi occurred approximately six months after Picardi's October 2016 steroid injection.

The Commissioner contends that the ALJ's RFC finding is supported further by the opinion of state-agency-medical consultant Dr.  Holmberg, who opined that Picardi "could frequently climb ramps/stairs and kneel, could occasionally climb ladders/ropes/scaffolds, stoop, crouch, and crawl, and could tolerate unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and hazards."  According to the Commissioner, the ALJ accorded appropriately "some weight" to this opinion, noting that the "preponderance of the evidence" supported no limitations for standing or walking without weight-bearing.

The Commissioner also contends that Picardi's reports of his daily activities support the ALJ's RFC finding. Picardi reported extensive walking and running. Additionally, Picardi reported that he went to the gym twice each week, took his children to activities, shopped for groceries, and performed some household chores.

According to the Commissioner, the ALJ evaluated properly Picardi's credibility respecting his claims about the intensity, persistence, and limiting effects of his subjective symptoms, and the ALJ's determination that Picardi's claims about his symptoms are not entirely consistent with the overall record is entitled to deference. In evaluating Picardi's credibility, the ALJ considered properly Picardi's "extensive physical activities, including regular running and walking for miles," and considered that the steroid injections Picardi received had largely been effective, "noting that [Picardi] did not need surgery since the July 2016 incision and dilation procedure and that he reported improvement between six to ten days after each injection."

The Commissioner maintains that the ALJ did not err with respect to considering Picardi's: (1) "purported difficulty breathing with humidity"; and (2) alleged "need for multiple absences to recover from his injections and bloodwork." The Commissioner contends that the ALJ did not err with respect to considering humidity because Picardi never reported to his medical providers that he had difficulty breathing with humidity and Dr. Holmberg opined that Picardi could tolerate unlimited exposure to humidity. Additionally, the Commissioner asserts that the jobs of park aide and security guard do not involve exposure to humidity, because "while the jobs require one to be outside frequently, exposure to wet and/or humid conditions as well as atmospheric conditions is 'not present.'" The Commissioner maintains that the ALJ did not err with respect to Picardi's purported need for absences because the ALJ noted that Picardi did not report problematic side effects from the steroid injections, and Picardi has not identified any treatment notes indicating that he reported such side effects to his medical providers. The treatment notes show merely that Picardi reported improvements after the injections, not that he needed time to recover from them. Furthermore, Picardi has not established that his bloodwork appointments, which occur once every three months, would interfere with his ability to maintain

a regular schedule. According to the Commissioner, because the RFC finding was supported by substantial evidence, the ALJ did not err in the hypotheticals posed to the vocational expert or in finding Picardi could perform the jobs of park aide, security guard, and alarm investigator.

The Commissioner contends that the ALJ's decision was based on a fully developed record, as no obvious gaps in the record exist that would obligate the ALJ to seek additional information. The record contained "years of treatment notes, the opinion of a consultative examiner, the opinion of a state agency medical consultant, [Picardi's] testimony at the administrative hearing, and [Picardi's] statements in a questionnaire about his daily activities." Moreover, according to the Commissioner, the April 2017 opinions of Drs. Spooner and Holmberg were not "stale" because the medical evidence dated after these opinions were rendered did not raise doubts about the reliability of these opinions.

**PICARDI'S REPLY**

Picardi contends that "[the] RFC is not supported by substantial evidence because the ALJ failed to properly consider [Picardi's] allegations and improperly used her lay opinion to discredit his allegations instead of developing the record." Picardi also contends that the substantial evidence threshold is not nonexistent, and that the United States Supreme Court has stressed the importance of "not simply rubber-stamping agency factfinding" during judicial review. Dickinson v. Zurko, 527 U.S. 150, 162 (1999). Picardi maintains that the scope of judicial review of an ALJ's decision in a Social Security case encompasses "determining both whether the Commissioner has applied the correct legal standard and whether the determination is supported by substantial evidence."

Picardi contends that the jobs of park aide and security guard require frequent exposure to weather, according to their listings in the Dictionary of Occupational Titles, and "common sense

11

would clearly dictate that frequent exposure to the outdoors and weather would result in contact with humidity"; therefore, the ALJ erred in finding that Picardi could perform these jobs. Picardi contends further that the ALJ erred in not incorporating any absences into her RFC determination, and that this failure was harmful because the vocational expert testified that two absences per month would preclude the jobs of park aide, security guard, and alarm investigator as viable jobs for Picardi to perform.

Picardi contends that because the ALJ failed to develop the record properly, the ALJ proceeded without any medical opinion on the effects of steroid injections to Picardi's throat and how long Picardi needed to recuperate from the injections. Picardi maintains that the ALJ substituted improperly her lay opinion for a medical opinion. Picardi reiterates his argument that the opinions of Dr. Spooner and Dr. Holmberg were stale because they were rendered before Picardi needed "regular bloodwork, an increased frequency of Kenalog injections, and a higher dose of Kenalog being injected," and this change in Picardi's condition "raises doubts about the reliability of the opinions."

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

> Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

12

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted).  However, the Court need not remand the case if the ALJ only committed harmless error, i.e., where the "application of the correct legal principles to the record could lead only to the same conclusion." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted).

To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see 42 U.S.C. § 1382c(a)(3)(A).  The Social Security Administration's regulations establish a five-step process for determining a disability claim.  See 20 C.F.R. § 404.1520(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further.  At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  At step two, the [Social Security Administration] will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Social Security Administration] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the [Social Security Administration] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.
>
> Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) (internal citations omitted).

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). However, when there is sufficient evidence in the record for the ALJ to determine whether the claimant is disabled, the ALJ will make a decision based on that evidence. See 20 C.F.R. § 404.1520b(a). If there is insufficient evidence in the record to determine whether the claimant is disabled, the ALJ may take additional actions to develop the record, including recontacting a medical source or requesting additional existing evidence. See 20 C.F.R. § 404.1520b(b). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citation omitted).

When a claimant alleges symptoms, such as pain, that limit the claimant's capacity for work, the ALJ is required to follow a two-step process to evaluate the claimant's credibility. See 20 C.F.R. § 404.1529(c). The ALJ must first determine whether a claimant has a "medically determinable impairment(s) that could reasonably be expected to produce" the claimant's reports of symptoms such as pain. 20 C.F.R. § 404.1529(c). If a claimant's symptoms "suggest a greater severity of impairment than can be shown by objective medical evidence alone," then, to determine the extent to which pain affects the claimant's ability to perform basic work activities, the ALJ considers other evidence, including, inter alia, medical opinion evidence, the claimant's prior work record, the claimant's statements about his or her symptoms, the claimant's daily activities, medications and other treatments that the claimant uses to manage pain, and any other measures the claimant uses to reduce pain. 20 C.F.R. § 404.1529(c). A claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms,

such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(4).  In making a credibility determination, the ALJ's opinion must give "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  Titles II & XVI: Evaluation of Symptoms in Disability Claims, Social Security Ruling ["SSR"] 16-3P (Oct. 25, 2017).

"Although the claimant bears the general burden of proving that he is disabled under the statute, 'if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'"  Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

## APPLICATION OF LEGAL STANDARD

**Absences**

Picardi contends that the ALJ erred with respect to the impact that absences from work would have by failing to: (1) credit Picardi's testimony that he needed multiple days off work to recover from steroid injections to his throat; and (2) address Picardi's testimony that he required an additional day off work every three months to attend bloodwork appointments.

The ALJ's factual finding that Picardi did not experience symptoms that would require him to be absent from work following steroid injections to his throat is not supported by substantial evidence.  At the hearing, Picardi testified that he needed to take one day off work for each injection, followed by another three to five days off following each injection to recover from pain caused by the procedure and to allow the swelling caused by the procedure to subside.

The ALJ declined to incorporate any absences in her RFC determination, finding that "the record confirms that [Picardi] has required steroid injections to mitigate swelling/inflammation in his throat on multiple occasions…. However, the record fails to support that the claimant had difficulty recovering from these injections for multiple days to the point that he would otherwise miss work for multiple days afterward."  The ALJ further found that there was no evidentiary support for Picardi's "explicit allegation that he would miss multiple days of work in consecutive months in order to recover from his required treatment."   The ALJ explained that

> Curiously, neither Dr. Goldner nor Dr. Courey noted that the claimant ever reported any problematic side effects from the injections.  The only comments related to that possibility were that Dr. Courey wrote that the claimant noted "improvement about 10 days after the injection" in October 2016 and May 2017.  Then, in September 2017 that it took "six days or so to feel better." . . . In short, even when the claimant's breathing was at its worst/the injections 'wore off' (where, in each instance, concurrent endoscopy revealed only "very mild" inflammation), he was still able to run and walk for substantial distances on a regular basis.  Moreover, there is no evidence to support that the injections he received caused side effects or debilitating symptoms that would have required multiple days off to recover from, only that *improvement* took as long as 10 days after administration of the injections.

Although an ALJ's credibility determination is entitled to deference, see Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013), when, as here, an ALJ determines that a claimant's symptoms are not supported by the medical record, the ALJ must give "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3P.  When making an RFC determination, the ALJ "consider[s] the individual's symptoms … and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record."  SSR 16-3P; see also 20 C.F.R. § 404.1529(c)(4). While the ALJ in this case gave "specific reasons" for the weight given to Picardi's claimed symptoms, those reasons are not consistent with, or supported

16

by, the evidence in the record. Picardi's general ability to "walk and run for substantial distances on a regular basis" is not relevant to Picardi's condition in the days immediately following each injection and cannot provide support for the ALJ's factual finding that Picardi did not need to be absent from work for multiple days following each steroid injection.  While the ALJ is correct that the treatment notes of Dr. Goldner and Dr. Courey do not mention that Picardi reported symptoms that would require an absence from work while recovering from the injections, nothing exists in those treatment notes that contradicts Picardi's testimony that he experiences pain following each injection procedure that requires three to five days for him to recover.  The treatment notes do not discuss Picardi's recovery from the injection procedures at all, beyond an indication in Dr. Courey's treatment note on October 19, 2016, that he discussed "the risk of failure, injection pain[,] and airway obstruction" with Picardi in advance of a scheduled injection in October 2016.  The Court agrees with the ALJ that Dr. Courey's notations that Picardi "notes improvement about 10 days after the injection" and "too[k] six days or so to feel better" appear to refer to improvements in Picardi's breathing following the injection procedure; if this is the case, however, these notations do not bear on Picardi's recovery from any side effects of the procedure.  The record does not contain any post-procedure instructions provided to Picardi following the injections or any documents or information indicating Picardi's condition in the days immediately following each injection, aside from Picardi's hearing testimony regarding his post-injection recovery.  The record contains no medical opinion or other evidence regarding the length of time, if any, Picardi needed to recover from each injection, and the impact, if any, such recovery would have on absences from work.  As the ALJ noted, the only medical opinion in the record is that of consultative examiner Dr. Spooner; however, while Dr. Spooner mentioned

Picardi's Kenalog injections in her report, she offered no opinion on Picardi's recovery from the injections.

The ALJ concluded that the lack of information in the record regarding Picardi's symptoms following the injection procedures meant that Picardi experienced no symptoms or side effects following the injections that would require him to be absent from work.  The ALJ reached this conclusion without the benefit of any medical opinion or other evidence to support it.  The Court is mindful that "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations," Orn v. Astrue, 495 F.3d 625, 634 (9th Cir. 2007); therefore, the lack of information in Dr. Courey and Dr. Goldner's treatment notes regarding Picardi's recovery from the injection procedures is not fatal to Picardi's claim that three to five days of recovery is needed.  In reaching the conclusion that no recovery time is needed in the absence of any evidence regarding Picardi's recovery save for his own testimony, the ALJ substituted impermissibly her lay opinion for that of a medical professional.  See Rosa, 168 F.3d at 79.

Instead of relying on her lay opinion, the ALJ should have fulfilled her affirmative duty to develop the record by either re-contacting Dr. Courey or Dr. Goldner, or otherwise obtaining evidence about Picardi's recovery from the injections. The ALJ's failure to do so was not harmless.  The vocational expert testified that two or more absences from work, per month, would preclude the performance of the occupations in which the ALJ determined Picardi could engage.  If the ALJ had credited Picardi's testimony that he would miss work the day of each injection plus three to five days thereafter to recover, then in each month that Picardi received injections, he would be absent from work for four to six days, which would preclude him from engaging in the occupations the ALJ determined were available to Picardi.  This would undercut

the ALJ's finding that jobs exist in significant numbers in the national economy that Picardi

could perform.  Moreover, the ALJ failed to address Picardi's testimony that he would need

additional time off work to attend bloodwork appointments related to his thrombocytosis, a blood

disorder.  The ALJ's failure to consider this additional need to be absent from work frustrates

judicial review of her determination regarding Picardi's claimed need for absences.

Accordingly, the following factual findings are not supported by substantial evidence: (1)

the ALJ's RFC determination; and (2) the ALJ's finding that Picardi is able to perform jobs that

exists in significant numbers in the national economy.  For these reasons, remand is warranted.

**Humidity**

At the hearing, Picardi testified that when the weather is humid, it is "tough to breathe" at

times when the relief afforded by a Kenalog injection has worn off.  Picardi contends that the

ALJ erred in not referencing this testimony in her decision.  According to Picardi, the ALJ's

failure to incorporate an avoidance of humidity into the RFC findings and the hypothetical

questions posed to the vocational expert was harmful because two of the occupations that the

ALJ determined that Picardi could perform, park aide and security guard, "have frequent

exposure to weather, which inherently includes humidity."  Picardi maintains that although the

descriptions in the Dictionary of Occupational Titles include the notations "Wet and/or Humid:

Not Present," this category relates to "contact with water or other liquids or exposure to

nonweather-related humid conditions," according to the Social Security Administration's

Program Operations Manual System ["POMS"], DI 25001.001(A)(92), not to weather-related

humidity.

Picardi makes citation to no authority for the proposition that "exposure to weather" includes exposure to humidity, instead he argues that this is supported by common sense.[1] Based on the Court's review of the applicable Social Security Administration regulations and guidance, it is not clear to the Court that the ALJ's inclusion of a limitation concerning humidity in her RFC finding and in her questions to the vocational expert would have changed the vocational expert's testimony regarding the occupations of park aide and security guard and, therefore, would have altered the ALJ's conclusion that jobs exist in significant numbers in the national economy that Picardi can perform.  Consequently, the Court concludes that, if the ALJ erred in failing to incorporate an avoidance of humidity into the RFC and in posing questions to the vocational expert, these errors were harmless.

## RECOMMENDATION

For the foregoing reasons, I recommend that: (1) the plaintiff's motion for judgment on the pleadings, Docket Entry No. 14, be granted and the matter remanded to the Commissioner; and (2) the Commissioner's motion for judgment on the pleadings, Docket Entry No. 18, be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court.  Any requests for an extension of time for filing objections must be

---

[1] POMS, DI 25001.001(A)(22) defines "exposure to weather" as "exposure to outside atmospheric conditions." "Outside atmospheric conditions" is not defined, but "atmospheric conditions" is defined as "exposure to conditions that affect the respiratory system, eyes, or the skin such as: fumes, noxious odors, dusts, mists, gases, and poor ventilation," POMS, DI 25001.001(A)(4).  However, "outside atmospheric conditions" does not seem to include these conditions, as both park aide and security guard involve frequent exposure to weather, but atmospheric conditions are "not present," according to their entries in the Dictionary of Occupational Titles.  See DICOT 249.367-082; DICOT 372.667-034.

directed to Judge Liman.  Failure to file objections within fourteen (14) days will result in a

waiver of objections and will preclude appellate review.  See Thomas v. Arn, 474 U.S. 140, 106

S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York                              Respectfully submitted,
       October 18, 2021

                                                           Kevin Nathaniel Fox
                                                           KEVIN NATHANIEL FOX
                                                         UNITED STATES MAGISTRATE JUDGE